IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NUTRIMATIX INC., a Nevada
corporation n/k/a STYR LABS, INC.,

CIVIL ACTION NO. 6:15-cv-790-RBD-DAB

      Plaintiff,

vs.

XYMOGEN, INC., an
Illinois corporation,

      Defendant.

_____/

## DEFENDANT'S DAUBERT MOTION AND MOTION *IN LIMINE* TO EXCLUDE AND STRIKE THE TESTIMONY AND REPORTS OF RICHARD RAMPELL AND JOSH SANTOS AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Defendant, XYMOGEN, INC., an Illinois corporation ("Xymogen"), by and through its undersigned attorneys, and pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and Rules 702 and 703, Federal Rules of Evidence, files its Daubert Motion and Motion *in Limine* to Exclude and Strike the Testimony and Reports of Richard Rampell and Josh Santos and Incorporated Memorandum of Law in Support, and states:

### BACKGROUND

Plaintiff, NUTRIMATIX, INC., a Nevada corporation n/k/a Styr Labs, Inc. ("Nutrimatix"), is suing Xymogen for damages stemming from alleged breaches of contract and warranty. As alleged in the Complaint, Nutrimatix is a company formed by Sergio Radovcic ("Radovcic") to develop a smartphone/tablet app that would deliver "personalized nutritional supplement information to the user, based on a patent-pending algorithm that incorporates decades of nutriceutical research." (Complaint, ¶ 12). Xymogen is a manufacturer of high-quality nutritional supplements and vitamins with state-of-the-art facilities in Orlando, Florida. Briefly,

the Complaint alleges Nutrimatix contracted with Xymogen to produce, manufacture, and package eight (8) custom nutritional supplements and one electrolyte product, all to be individually packaged in "stick packs." The Complaint further alleges Xymogen failed to timely deliver these products and that the delivered products were defective, causing Nutrimatix to lose profits and business opportunities arising from the delay of its product release.

On April 8, 2016, pursuant to the Court's Case Management and Scheduling Order entered August 26, 2015 (Doc. No. 17) (the "CMSO"), Nutrimatix disclosed Richard Rampell ("Rampell") as an expert and provided Xymogen with his report (the "Rampell Report"), a true and correct copy of which is attached and incorporated by reference as **Exhibit "A"**. Nutrimatix also disclosed Josh Santos ("Santos") as an expert and provided his report (the "Santos Report"), a true and correct copy of which is attached and incorporated by reference as **Exhibit "B"**.

In the Rampell Report, Rampell provides an opinion on "damages suffered by Nutrimatix, Inc. arising out of the breaches of contract and warranty by Xymogen, Inc. as set forth in the Complaint." (Rampell Report, p. 1). In particular, Rampell's opinion is that Nutrimatix suffered total incidental and consequential damages in the amount of $16,042,644.00, comprised of: $152,386 for production and inventory acquisition, $251,111 for unrecovered operating expenses, $30,945 for unrecovered residual expenses, $15,637,038 in lost profits, and $28,836 in sales revenue realized. (Rampell Report, p. 8). Rampell estimated lost profits by analyzing "historical fitness app growth rates" and "historical conversion rate data" and extrapolating potential profits from September 15, 2014 through December 31, 2016. (Rampell Report, p. 7; Ex. E). Rampell's estimates were based on "Radovcic's experience and knowledge of the vitamin and supplement industry, as well as historical information on subscription based services." (Rampell Report, p. 7-8). In particular, Rampell relied upon a three-year profit and

loss projection for Nutrimatix prepared by Radovcic (a true and correct copy of which is attached hereto as **Exhibit "C"**), an investor presentation prepared by Radovcic (a true and correct copy of which is attached hereto as **Exhibit "D"**), Nutrimatix's income statement for 2014-2015 (a true and correct copy of which is attached hereto as **Exhibit "E"**), and undisclosed "Account Transactions." (Rampell Report, Ex. D).

In the Santos Report, Santos claimed to have tested five supplements that Xymogen delivered to Nutrimatix. Based on these tests, Santos offers three conclusions: (1) the correct vitamin and mineral composition of the samples was represented in Santos' Report (Santos Report, p. 3-5, 12); (2) the samples' labels failed to comply with FDA regulations (Santos Report, p. 12); and (3) the samples potentially posed health risks. (Santos Report, p. 13).

## RELIEF REQUESTED AND MEMORANDUM OF LAW

Pursuant to *Daubert* and Federal Rules of Evidence 702 and 703, Xymogen requests the exclusion and striking of Rampell's and Santos' testimony and reports, in whole or in part, as to their opinions, as more particularly described herein.

**I.      Rampell's Report and Testimony Should Be Stricken and Excluded**

      **A.      Rampell's Report and testimony should be stricken and excluded pursuant to Fed. R. Civ. P. 26 because Nutrimatix failed to timely disclose a significant change in its theory of damages.**

Federal Rule of Civil Procedure 26(a)(1)(C) requires that a party must, without awaiting a discovery request, provide to other parties

> a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Rule 26(e) imposes a continuing obligation to supplement the initial disclosures under Rule 26(a)(1) whenever the parties find that the initial disclosures were "incomplete or incorrect,"

making the operation of Rule 26 the "functional equivalent of a Standing Request for Production under Rule 34." *City and Cnty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 220 (N.D. Cal. 2003) (*quoting* Fed. R. Civ. P. 26 Advisory Committee Notes, 1993 Amendment). Federal Rule of Civil Procedure 37(c) allows a court to exclude any evidence pertaining to damages that a party does not affirmatively disclose. Federal courts have ruled *in limine* to preclude evidence of damages where the damages claimed were not adequately disclosed in discovery. *See Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1222 (11th Cir. 2010).

In this case, Nutrimatix has changed its theory of damages without disclosure to Xymogen until delivery of the Rampell Report. The Complaint states that Nutrimatix has "suffered damage to its brand due to the delayed product release . . ." (Complaint, ¶ 43). Nutrimatix's Rule 26(a)(1) disclosures, served to Xymogen on September 25, 2015, also state Nutrimatix suffered "incidental and consequential damages" due to, among other things, "[l]ost business opportunities and profits *from the delay of its product launch* (at least approximately $180,000)." (Nutrimatix Initial Disclosures, p. 4) (emphasis added.) A true and correct copy of Nutrimatix's Initial Disclosures is attached hereto as **Exhibit "F"**. Nutrimatix never updated its Rule 26 disclosures after serving its initial disclosures. On April 8, 2016, Nutrimatix provided a copy of the Rampell Report to counsel for Xymogen, and discovery closed on May 27, 2016.

In stark contrast to Nutrimatix's $180,000 estimate of "lost opportunities and profits from the delay of its product launch," the Rampell Report concludes Nutrimatix suffered lost profits in the amount of $15,637,038. Rampell's estimate of lost profits is approximately *86 times* Nutrimatix's Rule 26 estimate because Rampell projected lost profits for nearly three years of Nutrimatix's hypothetical business life, rather than estimating delay damages. Nutrimatix's complete change in theory, as well as the magnitude of the disparity between Nutrimatix's initial

estimate and the amount in the Rampell Report, along with the timing of Nutrimatix's delivery of the Rampell Report, is prejudicial to Xymogen and contrary to Rule 26. Xymogen prepared for this case for nearly seven months reasonably believing, based on the Complaint and Nutrimatix's Rule 26 disclosures, that Nutrimatix's theory of the case was delay damages, and that the maximum exposure on the issue of lost profits due to the alleged delay was approximately $180,000, or somewhere in the ballpark of $180,000. Nutrimatix completely blindsided Xymogen with the Rampell Report. The Court should therefore strike Rampell's Report and preclude Rampell from testifying due to Nutrimatix's inadequate disclosure under Rule 26(a)(1) and its sudden and prejudicial change in its damages theory.

> **B.     Rampell's Report and testimony should be stricken and excluded pursuant to Florida law because Xymogen did not have reason to know at the time of contracting that a 90-day delay would lead to $15 million in lost profits.**

Under Florida law, consequential damages are awardable for "[a]ny loss resulting from general or particular requirements and needs *of which the seller at the time of contracting had reason to know* and which could not reasonably be prevented by cover or otherwise." Fla. Stat. § 672.715(2)(a) (emphasis added). As a matter of law, Xymogen had no reason to know at the time of contracting with Nutrimatix that its failure to timely deliver the electrolyte and Custom Formulas by a date certain, as alleged in the Complaint, could have resulted in over $15 million in lost profits. It is undisputed that when Nutrimatix approached Xymogen to discuss development of the Custom Formulas, Nutrimatix's business was nothing more than a concept; Nutrimatix had no customers, no products, and no sales. Nutrimatix as a company literally had no value. Thus, at most, Xymogen arguably could have been aware that its failure to deliver products to Nutrimatix would result in lost profits *on the sale of those products not delivered.* That is, true delay damages may have been foreseeable. But Nutrimatix and Rampell cannot

reasonably impute to Xymogen knowledge of Nutrimatix's future lost profits based on the assumption that Nutrimatix was going to be a wildly successful company. Accordingly, because Rampell unreasonably assumed that Nutrimatix would grow from $0 in revenues to over $15 million in profits in a little over two years, and that Xymogen should have known this, the Court should strike Rampell's Report and exclude Rampell's testimony on the issue of lost profits.

    **C.**     **Rampell's Report and testimony should be stricken and excluded pursuant to Florida law because lost profits are compensable only if the defendant's actions caused the damages and plaintiff adequately establishes the amount of lost profits with a reasonable degree of certainty.**

This is a dispute between merchants concerning a contract for the sale of goods governed by Article 2 of the Uniform Commercial Code, Florida Statute 672.101 *et. seq*. Under Fla. Stat. § 672.713(1), "the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages . . . but less expenses saved in consequence of the seller's breach." Consequential damages are awardable for "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Fla. Stat. § 672.715(2)(a). Lost profits falls under the category of consequential damages under § 672.715(2)(a). *HGI Assoc., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 878 (11th Cir. 2005).

Under Florida law, "the general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss." *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Sup. 2d 1319, 1339 (S.D. Fla. 2006) (*quoting Levitt-ANSCA Towne Park P'ship v. Smith & Co. Inc.*, 873 So. 2d 392, 396 (Fla. 4th DCA 2004)). "The rationale for applying heightened skepticism to new businesses' claims of

lost profits is clear: the commercial success of a new venture should be determined in the marketplace, not in the courtroom." *Id.* To avoid allowing start-up corporations to reap unearned profits, courts "routinely reject lost profit claims from unestablished businesses." *Id.* (collecting cases).

An award of "[p]rospective profits must be proven with reasonable certainty" and a reasonable evidentiary basis must support such prospective profits. *Born v. Goldstein,* 450 So. 2d 262, 264 (Fla. 5th DCA 1984). Lost future profits "cannot be based on speculation or conjecture." *River Bridge Corp. v. Am. Somax Ventures ex rel. Am. Home Dev. Corp.*, 18 So. 3d 648, 651 (Fla. 4th DCA 2009) (*quoting Sotschin v. Doll Enters., Inc.,* 847 So. 2d 1123, 1128 n.6 (Fla. 3d DCA 2003)). "The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture." *Paul Gottlieb & Co., Inc. v. Alps S. Corp.*, 985 So. 2d 1, 9 (Fla. 2d DCA 2007) (citation omitted). "In Florida, unless the fact-finder is presented with evidence which will enable it to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture, the claimant may not recover such damages." *Himes v. Brown & Co. Sec. Corp.*, 518 So. 2d 937, 938 (Fla. 3d DCA 1987) (rejecting speculative testimony that but for the defendant's actions, the plaintiff would have completed time sensitive transactions enabling him to earn a profit).

Generally, lost profits are proven using either the "before and after theory," i.e., using the plaintiff's historical performance to extrapolate future losses, or the "yardstick" method. *Devon Med., Inc. v. Ryvmed Med., Inc.,* 60 So. 3d 1125, 1128 (Fla. 4th DCA 2011). "The yardstick test is generally used when a business has not been established long enough to compile an earnings record that would sufficiently demonstrate lost profits and compares the profits of businesses that

are closely comparable to the plaintiff's." *River Bridge Corp. v. Am. Somax Ventures ex rel. Am. Home Dev. Corp.*, 18 So. 3d 648, 650 (Fla. 4th DCA 2009).

Where an expert's testimony as to the amount of lost profits is based on uncertainty or speculation, such testimony is insufficient to sustain a damage award of future profits. *River Bridge*, 18 So. 3d at 651. Speculation that profits were lost "is insufficient to justify the award of profits." *Gottlieb*, 985 So. 2d at 9. "[W]hen the evidence is too speculative, it is not proper for jury consideration." *Meadows v. English, McCaughan & O'Bryan, P.A.*, 909 So. 2d 926, 928 (Fla. 4th DCA 2005). A projection in a prospectus that is "little more than an unsupported wish list of what the [plaintiff] hoped would occur in the coming years[,]" cannot support a lost profits award. *North Dade Cnty. Dev. Cor. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. 3d DCA 2002).

> [A] start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate . . . capitalizing fantasized earnings into a huge present value sought as damages . . . .

*Alphamed*, 432 F. Supp. 2d at 1341 (citation omitted). Damages must be proven. *Id.* "[I]f plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery." *Id.* at 1342 (citation omitted).

Florida law also requires a jury to reduce an award of future profits to its present value. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1180 (11th Cir. 2002) (citing *W.R. Grace & Co.-Conn. V. Pyke*, 661 So. 2d 1301, 1302 (Fla. 2d DCA 1995)). "Present value of future damages in most cases . . . is determined by expert testimony that provides information concerning the total amount of damages that will be incurred in the future and then provides an appropriate interest rate for discounting those damages to present value." *Mission Square, Inc. v. O'Malley's, Inc.*, 783 So. 2d 1151, 1152 (Fla. 1st DCA 2001).

Finally, a completely destroyed business is valued on the date of loss, and an ongoing business logically cannot be completely destroyed. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 47 (Fla. 3rd DCA 2006); *Polyglycoat Corp. v. Hirsh Distribs. Inc.*, 442 So. 2d 960, 960 (Fla. 4th DCA 1983). Where the business is not completely destroyed, then it may recover lost profits. *Aetna Life & Cas. Co. v. Little,* 384 So. 2d 213, 216 (Fla. 4th DCA 1980). A business may not recover both lost profits and the market value of the business. *Sotschin v. Doll Enters., Inc.*, 847 So. 2d 1123, 1128 n.6 (Fla. 3d DCA 2003); *Trailer Ranch, Inc. v. Levine,* 523 So. 2d 629, 631 (Fla. 4th DCA 1988).

**D.      Rampell's Report and testimony should be stricken and excluded pursuant to Florida law because Nutrimatix's business was completely destroyed, precluding recovery of lost profits.**

As stated above, pursuant to Florida law, a completely destroyed business may recover only the market value of the business as of the date of loss and may not recover lost profits. *Susan Fixel*, 921 So. 2d at 46 (citing *Montage Grp. Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So. 2d 180, 195 (Fla. 2d DCA 2004)). Nutrimatix admits it has stopped selling the products Xymogen supplied. Indeed, Nutrimatix even seeks to destroy the remaining Xymogen products in its possession because Nutrimatix has been unwilling sell them. (*See* Nutrimatix's Motion for Protective Order to Permit Disposal of Goods, Doc. No. 37). Radovcic admits that he immediately stopped selling two of the custom formulas "instantly" after receiving a complaint on March 9, 2015. (Complaint ¶ 36; Deposition of Sergio Radovcic, p. 235, ln. 4-5, a true and correct copy of which is attached as **Exhibit "G"**). Further, Radovcic admits he has stopped using the Nutrimatix name and started using the "Styr Labs" name. (Radovcic, p. 229, ln. 13-23). Styr Labs has had no sales to date and is planning to start selling liquid-based supplements near the end of July 2016. (Radovcic, p. 230, ln. 1-13). Finally, the Nutrimatix Income Statement for

January 1, 2014 through December 31, 2015 shows total sales for this time period of only $28,827.79. (*See* **Ex. E**).

Despite the undisputed fact that Nutrimatix all but stopped selling products in March 2015, Rampell erroneously uses the lost profit method of calculating consequential damages and does not provide a market value for Nutrimatix's business as of the date of loss. Rampell wrongly assumes, based on *one* promotional event, that Nutrimatix could have turned into a successful app-based, nutritional supplement sales company. The undisputed facts do not support this conclusion. To the contrary, the undisputed facts establish Radovcic decided to stop doing business as Nutrimatix and to start doing business sometime in the summer of 2016 as a new entity with a different product line. At a minimum, there are insufficient facts to draw any conclusion as to the future success or viability of Nutrimatix, necessitating the "destroyed business" analysis set forth above. But the facts show Nutrimatix stopped selling products in spring 2015, and has not sold a product since. Nutrimatix was completely destroyed as of spring 2015. Rampell's testimony on lost profits is thus based on a completely flawed and inapplicable methodology. Therefore, Rampell's entire report should be stricken, and Rampell's testimony excluded, on the issue of lost profits.

  **E.**  **Rampell's Report and testimony should be stricken and excluded pursuant to *Daubert* and Fed. R. Evid. 702.**

    **1.**  **Pursuant to *Daubert* and Rule 702, expert testimony must be based on sufficient facts or data and based on a reliable method.**

In diversity actions, federal courts apply the Federal Rules of Evidence to determine whether expert testimony is sufficiently reliable to submit to a jury. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Federal Rule of Evidence 702 provides:

> If scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

> knowledge, skill, experience, training, or education may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

Pursuant to *Daubert*, the trial court assessing the reliability of an expert's evidence must act as a "gatekeeper" by conducting "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

The Eleventh Circuit Court of Appeals requires trial courts to engage in a "rigorous three-party inquiry" assessing whether:

> (1) the expert is qualified to testify competently regarding the matters he
> intends to address; (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated in *Daubert*; and (3) the testimony assists the trier of fact,
> through the application of scientific, technical, or specialized expertise, to
> understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004). The proponent of expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each prong of *Daubert*. *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

> **2.    Rampell relies on insufficient facts and data and uses an
> unreliable method of calculating Nutrimatix's alleged lost
> profits.**

The only track record for Nutrimatix available to Rampell is the data from the 2014 Disney Marathon. This promotional event was Nutrimatix's first and only attempt to market its product. The data generated from this event and used in the Rampell Report consists only of the

number of app downloads and the number of orders allegedly resulting from these downloads.[1]
Based on this one race, at which Nutrimatix distributed approximately 40,000 packets of its
electrolyte powder for free, which allegedly translated to 1,248 app downloads[2] and 180 orders
of the custom formulas, Rampell concludes the app's launch was a "success" because the
"realized conversion rate (downloads to purchases)" was 14.42%, while "the average conversion
rate in the United States during 2015 was 3.35% for tablets and only 1.22% for smartphones."
Rampell Report , p. 7.

From this single data point, Rampell makes the unreasonable leap that Nutrimatix's
business could have been successful, but for Xymogen's alleged actions. Assuming Nutrimatix
could have been a successful operating company, but acknowledging the lack of sufficient date
to rely upon, the Rampell Report bases its estimate of lost profits on "historical fitness app
growth rates as well as historical conversion rate data." (Rampell Report , p. 7). That is, because
Nutrimatix did not have enough of its own historical data, Rampell used generic app data for
successful operating companies to perform his calculations. The Rampell Report's methodology
is thus flawed at the outset because it wrongly assumes, based on *one* promotional event, that
Nutrimatix could have turned into a successful app-based sales company despite an
overwhelming lack of evidence to support this conclusion. At a minimum, there are simply

---

[1] Recent documents produced to Xymogen show the Nutrimatix app had only 145 downloads in 2015, and
no downloads for 2016. A true and correct copy of Nutrimatix's download records are attached as **Exhibit "H"**.
Nutrimatix's 2014 tax return shows total sales of $1,225.00, with total income of $5.00. A true and correct copy of
Nutrimatix's 2014 tax return is attached as **Exhibit "I"**). The 2014 tax return also shows advertising expenses of
$21,486, contrary to the $1 million dollars estimated in the Complaint (¶ 33). The 2014 tax return also shows a loss
of $105,075.00. Nutrimatix's income statement for January 1, 2014 – December 31, 2015 (*See* Ex. E) shows sales of
$28,827.75, gross profits of ($159,904.86) and total loss of ($441,874.33). The largest category of expenses shown
is "Marketing and Promotion" in the amount of $88,529.34. However, a review of these marketing expense records
shows that most of these expenses were actually personal expenses for Radovcic. A true and correct copy of
Nutrimatix's marketing expense records is attached as **Exhibit "J"**.
[2] Nutrimatix's production shows 1,248 is the total number of downloads across all platforms for all time
periods, not just in the January 2015 time period. (*See* Ex. G).

insufficient facts to draw any conclusion as to the future success or viability of Nutrimatix, necessitating the "destroyed company" analysis set forth above.

But even assuming the viability of Nutrimatix's business, the Rampell Report's lost profit analysis is flawed. The Rampell Report's flaws are laid bare in the footnotes to Exhibit E of the Rampell Report, where Rampell sets forth the sources for the app growth and conversion rates used. There, Rampell explains: (1) he used Nutrimatix's Investor Presentation for the estimate of one million downloads in the first year (fn. A), which was prepared by Radovcic and entirely speculative; (2) the growth rate for the app download rate was "based on an average of selected fitness app actual growth rates experience," (fn. B) though the Rampell Report does not state which apps, how many apps, or how the selected apps are relevant or comparable to Nutrimatix's app, making it impossible for anyone to verify Rampell's method of calculating the growth rate; (3) the conversion and order rates used were "a weighted average of the actual conversion rates" for certain time periods (fns. C, D, and E), though the Rampell Report does not disclose what types of apps were used for comparison and fails to provide the calculations for these rates; and (4) the reorder rates used were based on Radovcic's projections "based on his experience and industry data" (fn. H), even though Radovcic testified multiple times at his deposition that he had never before manufactured and sold a nutritional supplement product (Radovcic Dep., p. 44, ln. 13-19; p. 65, ln. 5-12; p. 111, ln. 1-2), and thus lacked any relevant experience or industry data. In sum, the data Rampell relies on is either obviously a bad yardstick, not fully disclosed, or based on Radovcic's pre-product launch projections, which are inherently speculative and unreliable.

Because Nutrimatix had no sales history on which to base a "before and after approach" for calculating lost profits, the Rampell Report should have relied on the "yardstick" method.

Thus, under Florida law, to be reliable, the Rampell Report must compare the profits of similar companies to extrapolate the potential profitability of Nutrimatix. The Rampell Report fails to do this. In fact, the Rampell Report includes no analysis of profits earned in the first three years of a similar nutritional supplement company. Instead, the Rampell Report analyzes "conversion rates" of other "select fitness apps." (Rampell Report , Ex. E., fn. B). The obvious problem with this method is that conversion rates say nothing about a company's profitability.

Moreover, footnotes B, C, D, E, and F to Exhibit E of the Rampell Report make clear Rampell used general fitness app download and conversion rates, and did not limit his market data to apps devoted to selling a nutritional supplement. The Rampell Report simply does not use a reliable yardstick even when performing the dubious comparison to average app download and conversion rates. Indeed, the yardstick method is particularly difficult in this case because, by the Rampell Report's own admission, "[t]he [Nutrimatix] app was the first of its kind to use a proprietary, patent-pending algorithm, to convert fitness data into nutritional advice." (Rampell Report, p. 7 (citing the Nutrimatix Investor Presentation)). Thus, generic fitness app download growth rates and conversion rates are not reliable yardsticks by which to project Nutrimatix's future performance, and tell us nothing about Nutrimatix's likely profitability.

But even more unreliable than using a bad yardstick is the Rampell Report's over-dependence on information found in Radovcic's pre-launch investor presentation slides. Rampell uses this speculative information as the basis for estimating the app will reach one million (1,000,000) downloads in the first year after the app's launch (Rampell Report, Ex. E., fn. A), and as the source for projected reorder rates that increase from 6 in the last quarter of 2014, to 8 in 2015, to 9 in 2015 (Rampell Report, Ex. E., fn. H). These are both crucial assumptions in the Rampell Report lifted directly from Radovcic's projections. Based on Radovcic's projection that

the app would reach one million downloads in the first year, the Rampell Report extrapolates, based on average growth rates from "selected fitness app actual growth rates," to nearly three million (3,000,000) downloads by the end of 2016. This wildly speculative download estimate, combined with the 2.45% conversion rate taken from average app rates, leads Rampell to estimate first time sales of $1,452,169 for 2015, and $3,173,430 for 2016.

By accepting without scrutiny Radovcic's first year download estimate, without any analysis of actual downloads achieved for the app (a mere 1,248 total across all platforms), Rampell fails to assess the likelihood of success of Nutrimatix's actual marketing strategy, which has significant, obvious pitfalls. For example, there is no discussion or analysis of how many races Nutrimatix would be permitted to distribute its free electrolyte product in promotion of its app and the custom nutritional supplements. It seems possible, if not likely, that other purveyors of electrolytes (e.g., Gatorade, Powerade, Vitamin Water, etc.) may have exclusive rights to provide such products at marathons and other races. The initial download rate used in the Rampell Report is thus entirely unexamined, detached from actual download numbers achieved (1,248, which is actually the *total* number of downloads the Nutrimatix app ever achieved, not just downloads attributable to the Disney Marathon promotion), and based solely on Radovcic's speculation.

The most speculative assumptions on Exhibit E, however, are the reorder rates estimated for 2015 and 2016 (8 and 9, respectively). These rates came directly from Nutrimatix's pre-launch projections. Rampell Report, Ex. E, fn. H. These reorder rates are the crux of Rampell's entire lost profit analysis. As explained in footnote I of the Rampell Report, "reorder units were calculated by multiplying the reorder rate by the units ordered by first time users." In plain English, the Rampell Report assumes, based solely on Radovcic's projections, that Nutrimatix

app users will reorder the custom supplements eight (8) times in 2015, and nine (9) times in 2016. This one assumption results in estimated reorder sales of $11,617,355 in 2015, and a truly staggering $28,560,867 in 2016. These figures are the embodiment of unsupported, pie-in-the-sky speculation.

Finally, the Rampell Report is unreliable because nobody reading it can check Rampell's work. The Rampell Report does not disclose the data relied upon to calculate the various download and growth rates. "Selected fitness app actual growth rates experienced" is the most specific Rampell gets when describing his yardstick sources. That is to say, not specific at all. The phrase "fitness app" encompasses yoga apps, workout apps, running apps, calorie counting apps, etc. Thus, disclosure of which apps Rampell used to derive the growth rates and conversion rates is crucial for allowing third parties to analyze his methodology. Without this information, the Rampell Report's methodology for deriving lost profits remains a mystery.

In sum, under *Daubert*, Rule 702, and Florida law, Rampell's Report is unreliable because it fails to use an applicable yardstick, fails to provide transparency in its methodology, and relies far too heavily on Radovcic's speculative pre-launch, pre-sales projections. Nutrimatix simply has an insufficient track record on which to base any prediction for the company's future success and profitability, and Rampell fails to use a reliable yardstick to measure Nutrimatix's potential profitability. The entire Rampell Report is a prime example of the type of speculation Florida courts have held cannot support an award of lost profits. Accordingly, the Court should strike the Rampell Report and exclude Rampell's testimony on lost profits.

3.   **The Rampell Report's methodology for calculating lost profits is also flawed and unreliable because it fails to account for mitigation strategies and fails to discount future profits to their present value.**

In addition to relying on insufficient and speculative data, the methodology of the Rampell Report is flawed for two more reasons. First, the Rampell Report fails to account for reasonable mitigation strategies the Plaintiff used or could have used, and is not limited to mere delay damages as alleged in the Complaint and stated in Nutrimatix's Rule 26 disclosures. If Nutrimatix's business had the potential for nearly $47,000,000 in sales and nearly $16,000,000 in total profits in less than three years, Nutrimatix should have, and could have, pursued this opportunity. Nutrimatix had the formulas and easily could have taken them to another manufacturer. Nutrimatix also had significant inventory of six out of eight of the custom formulas that it could have sold, and, had it paid Xymogen, it could have had all eight custom formulas.

Moreover, the Complaint alleges only that Nutrimatix seeks damages based on the delay of its product launch. No act of Xymogen is alleged to have harmed the Nutrimatix app, and Nutrimatix could have found substitute electrolyte product to continue its marketing strategy. In fact, Radovcic testified at his deposition that Styr Labs, the successor company to Nutrimatix, has taken the same formulas developed for production by Xymogen to another manufacturer and plans to start selling a liquid product based on the same formulas developed for Nutrimatix. Radovcic Depo., p. 231-232. Therefore, Nutrimatix's damages, if any, must be limited to any delay in its projected successful trajectory of sales and profits for which Xymogen's actions are found to be the cause. The Rampell Report instead estimates lost profits assuming a successful, and profitable business strategy, rather than limiting its estimate to delay damages based on

Xymogen's alleged 90 day delay in providing the Custom Formulas. The Rampell Report should be stricken for this fundamental flaw in methodology.

Second, under Florida law, an estimation of future damages must be reduced to its present value. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1180 (11th Cir. 2002) (citing *W.R. Grace & Co.-Conn. V. Pyke*, 661 So. 2d 1301, 1302 (Fla. 2d DCA 1995)). The Rampell Report's failure to reduce the stream of damage estimates to their present value grossly inflates the damage estimate by ignoring (1) the time value of money and (2) the uncertainty associated with making the estimates for lost profits. The fact that Rampell makes such a basic error in his methodology leaves no doubt that the Rampell Report is unreliable and must be stricken, and that Rampell must not be permitted to testify on the issue of lost profits at trial.

### 4. The Rampell Report includes supposed damages Xymogen cannot be liable for.

The Rampell Report wrongly adds "additional costs" in the amount of $371,030 imposed on Nutrimatix by Xymogen's alleged breaches. This figure is comprised of $14,000 in replacement electrolyte product for a race in fall 2014, $74,974 for re-engineering the boxes for the electrolyte sticks, $251,111 in startup and operating costs, $3,000 for testing, and $27,945 for storage of the allegedly useless custom formula sticks. None of these costs is compensable because Xymogen was not the cause of such "damages."

First, the $14,000 alleged replacement costs for the electrolyte purchased for the Marine Corps Marathon in October 2014 are not compensable. Radovcic testified that his other company, FitFul, not Nutrimatix, had a commitment to provide electrolyte product at the Marine Corps Marathon. Radovcic Depo. p. 210, ln. 3-9. Thus, FitFul, not Nutrimatix, had to find replacement product. Moreover, the Complaint (¶ 31) alleges Nutrimatix spent only $11,000 on such replacement product, not $14,000.

Second, the cost of the boxes and re-engineering for the boxes is not compensable. These costs were entirely the result of Nutrimatix/Radovcic getting ahead of itself by ordering packaging before it even had an approved formula. Xymogen cannot be liable for Nutrimatix's poor planning and decision-making.

Third, Nutrimatix would have incurred startup and operating costs, estimated at $251,111 regardless of the success or failure of its product launch. Nutrimatix cannot have any profits without incurring startup costs. These costs were not caused by anything Xymogen did or did not do; Nutrimatix incurred these costs the moment Radovcic decided to start the company. The Rampell Report wrongly includes these startup costs incurred by Nutrimatix because they "would have been recovered from the product's sales had Xymogen delivered per their promised dates on the purchase orders. However since the products were delayed and delivered defective, Nutrimatix never had the opportunity to recover the startup costs . . . ." (Rampell Report , p. 6). These expenses were entirely foreseeable and should reduce, not enlarge, any damages award. Yet again, the Rampell Report's methodology is fundamentally flawed, further demonstrating its unreliability.

Fourth, Nutrimatix did not perform any testing on the custom formulas until it decided to sue Xymogen. The testing was optional, and not reasonably foreseeable by Xymogen. Finally, Nutrimatix cannot recover storage costs for storing the supposedly useless products delivered by Xymogen. If the products were truly useless, it was completely unreasonable for Nutrimatix to keep and store the products.

II.   **Santos' Report and Testimony Should Be Stricken and Excluded Pursuant to *Daubert* and Fed. R. Evid. 702 and 703.**

A.   **Santos' Testimony Is Inadmissible Hearsay.**

Santos' testimony is not expert testimony; it is inadmissible hearsay. "Although Federal Rule of Evidence 703 permits expert witnesses to base their opinions on inadmissible hearsay in limited circumstances, it 'provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose.' " *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, 8:12-CV-691-T-24-MAP, 2014 WL 4986482, at *2 (M.D. Fla. 2014) (granting motion to exclude expert's testimony as to dates on which parties first offered various products for sale, where expert lacked personal knowledge of such dates and did not apply any expertise to those dates or draw any conclusions based on those dates) (*quoting* Fed. R. Evid. 703 Advisory Committee Notes, 2000 Amendments). Rule 703 "is not an open door to all inadmissible evidence disguised as expert opinion." *United States v. Scrima*, 819 F. 2d 996, 1002 (11th Cir. 1987). "[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal citation and quotation omitted).

Santos' assignment was two-fold: (1) "to test certain products manufactured by Defendant Xymogen, Inc." and (2) "to compare the claimed vitamins, minerals, and nutrients of those products with their actual chemical content as determined by the testing." (Cover Letter to Santos Report, p. 2). Based on his purported findings, Santos offered three opinions: (1) the correct vitamin and mineral content of the Samples were represented in Tables 2 through 4 of his report (Santos Report, p. 3-5, 12); (2) the samples' labels failed to comply with FDA regulations (Santos Report, p. 12); and (3) the samples potentially posed health risks. (Santos Report, p. 13).

In fact, Santos did not perform the first part of his assignment. Santos neither conducted nor supervised the tests that provide the data that appear in his report. Santos failed to disclose this fact in his report, but as made clear by emails appended to his report, Santos outsourced all testing to a third-party provider, Covance, Inc. (*See* **Ex. B** at LABDOOR000006-000007, LABDOOR000042, LABDOOR000055). Covance's reports showed the vitamin and mineral composition of the samples but did not contain any raw data. (*See* **Ex. B** at LABDOOR000016-000020, LABDOOR000043-000054, LABDOOR000059-000077). Santos simply copied Covance's results and pasted them into his own report. Santos did not interpret or analyze the Covance reports.

Just as in *Static Control*, Santos is merely parroting inadmissible hearsay data -- in this case the weights of various vitamins and minerals -- applying any expertise or drawing any conclusions from those data other than the opinion that the data are correct. The purpose of Santos testifying as to those weights is only to introduce evidence of those weights, rather than to explain the basis of any expert opinion or help the fact-finder to evaluate such opinion. *See Static Control Components, Inc.*, 2014 WL 4986482, at *3.[3]

B.     **Santos Is Not an Expert.**

Santos' Report makes no attempt to explain in what area Santos claims expertise, but it must be assumed that Santos purports to be an expert in the areas on which his Report offers opinions: (1) chemical testing (or at least reading reports stating the conclusions of chemical testing); (2) compliance with FDA regulations; and (3) the health effects of consumption of vitamins and minerals. Santos is not qualified by knowledge, skill, experience, training, or

---

[3] Also, by attempting to insulate the entity that actually conducted the tests and presenting the test results as his own, Santos deprives the fact-finder of the opportunity to learn about Covance's history and testing procedures. *See, e.g.*, http://www.canadianbusiness.com/business-news/federal-agency-considers-penalty-against-south-texas-research-facility-where-13-primates-died/.

education to testify as an expert on any of these matters. *See* Fed. R. Evid. 702. Santos is a recent college graduate of unknown academic ability with one year of experience in marketing and sales for a lab.

Santos graduated with a Bachelor of Science degree in Chemical-Biological Engineering only two years ago. Santos' resume fails to disclose his undergraduate curriculum, his grades, his GPA, his research, or any honors he may have received. The Report provides the Court with no insight into Santos' academic ability, and the Court cannot even determine whether Santos is an "A+" student or a "C-" student.

Santos' work experience is also insufficient to qualify him as an expert. Half of Santos' two-year work experience was in a fraternity as a "Regional Director." His resume does not explain his duties in this position or how they are relevant to the subject of his testimony. For the past year, Santos has worked at Labdoor, Inc. in the position of "Partner Development." His resume indicates that the majority of Santos' duties relate to sales, marketing, and client relationships. His resume does not explain how Santos' one-year experience at LabDoor is relevant to his testimony or makes him an expert. Therefore, Nutrimatix has failed to satisfy its burden of showing that Santos is qualified to testify as an expert on the subjects of his report, and Santos' testimony should be excluded.

### C.    Santos' Report Is Not Based on Sufficient Data.

Expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(b). Rule 702(b) "calls for a quantitative rather than qualitative analysis." Advisory Committee Notes, Fed. R. Evid. 702. " 'Determining the minimum sample size from which reliable extrapolations can be made to the sampled population is tricky,' *DeKoven v. Plaza Assocs.*, 599 F.3d 578, 581 (7th Cir. 2010), but a sample size of one is rarely, if ever, sufficient." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010).

Santos had Covance test only five of the six categories of supplements that Xymogen delivered to Nutrimatix, and for each category, Covance tested only a single sample. (Santos Report, p. 2-5). Of the five samples tested, results are completely unavailable for one of the samples. (Santos Report, p. 4, Table 3). Santos' Report even declines to extrapolate findings from Covance's tests to the rest of the products Xymogen delivered: "Testing results relate only to items tested." (Santos Report, p. 14). A sample size of one is insufficient here, where Xymogen delivered thousands of packets of supplements to Nutrimatix. This is hardly a case in which Nutrimatix had access to only a limited number of samples to test. Given that Nutrimatix had access to enough samples to make a statistically significant test, allowing Nutrimatix to present the fact-finder with conclusions based on results of four separate products would violate the spirit and letter of Rule 702(b).

### D.   Santos' Report Is Not the Product of Reliable Principles or Methods.

Federal Rule of Evidence 702(c) requires an expert to employ reliable principles and methods for each opinion offered by the expert. Fed. R. Evid. 702(c); *see Koken v. Black & Veatch Constr., Inc.*, 426 F.3d 39, 47-48 (1st Cir. 2005) (excluding expert's testimony for failure to explain any underlying methodology to justify opinions). Santos' methodology consisted of two steps: copying the conclusions in the Covance report and pasting them into Santos' own Report. This is neither science nor a method, nor does copying figures from one report and pasting them into another require an expert witness.

Santos also admits that his report is incomplete. Santos' Report states: "Riboflavin analyses for samples 1-3, the Biotin analyses for samples 1 and 3, and the arabinogalactan results for sample 4 were not available at the time of report submission." (Report, p. 12). No test results are available for one of the five samples tested. (Santos Report, p. 4, Table 3).

The timing of Santos' test also illustrates the utter lack of any methodology. Xymogen delivered the products to Nutrimatix around October or November 2014. Santos had Covance test Sample 4 approximately nine months later in August 2015. Santos then had Covance test the other samples another seven months later in March 2016. Despite expressly noting the possibility that storage conditions may affect the contents of a supplement, (Report, p. 13), Santos does not indicate whether the tests controlled for storage conditions, the passage of time, and the possible changes in the samples' composition during storage. The Report provides no data about the temperature, humidity, or other storage conditions of the samples that Santos tested. Additionally, Santos' Report fails to mention that Nutrimatix declined the option of having an expiration date or shelf life printed on the product and did not obtain any guarantee from Xymogen about the shelf life of the product. (*See* Custom Formula Quote, a true and correct copy of which is attached as **Exhibit "K"**).

In sum, Santos is not an expert, and the document he submitted is not an expert report. Santos simply paid a third party to test five samples and then copied and pasted the results without adding any analysis. Santos' Report is devoid of science, methodology, or expertise, and it would not help the fact-finder understand any issues in this case. Therefore, this Court should exclude Santos' Report and his testimony.

**Conclusion**

For the foregoing reasons, Defendant, XYMOGEN, INC., respectfully requests this Honorable Court to grant this Daubert Motion and Motion *in Limine* to Exclude and Strike the Testimony and Reports of Richard Rampell and Josh Santos, in whole or in part, and for such other and further relief as this Court deems just and proper.

## Middle District Local Rule 3.01(g) Certification.

Xymogen's counsel has conferred with counsel for Nutrimatix. Counsel for Nutrimatix does not agree to the relief sought herein.

## CERTIFICATE OF SERVICE

The forgoing DAUBERT MOTION AND MOTION *IN LIMINE* TO EXCLUDE OR STRIKE THE TESTIMONY AND REPORTS OF RICHARD RAMPELL AND JOSH SANTOS AND MEMORANDUM OF LAW IN SUPPORT was filed on June 24, 2016, via the Court's Electronic Filing System, which will provide electronic notice to Plaintiff through its counsel Andrew S. Kwan, Esq., kwan@beasleylaw.net, and Ramond E. Kramer, kramer@beasleylaw.net.

HOWARD S. MARKS, ESQ.
Florida Bar Number: 0750085
Email: hmarks@burr.com
Secondary Email: dmmorton@burr.com
PETER C. VILMOS, ESQ.
Florida Bar Number: 075061
Email: pvilmos@burr.com
Secondary Email: nwmosley@burr.com
CHRISTOPHER R. THOMPSON, ESQ.
Florida Bar Number: 0093102
Email: crthompson@burr.com
Secondary Email: dmartini@burr.com
BURR & FORMAN LLP
200 South Orange Avenue, Suite 800
Orlando, Florida 32801
Telephone: (407) 540-6600
*Counsel for Xymogen, Inc.*