**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

NUTRIMATIX INC.,

        Plaintiff/ Counter
        Defendant,

v.                                  Case No. 6:15-cv-790-Orl-37GJK

XYMOGEN, INC.,

        Defendant/ Counter
        Claimant.

_____

### ORDER

This cause is before the Court on the following:

1.      Defendant's *Daubert* Motion and Motion in Limine to Exclude and Strike the Testimony and Report of Richard Rampell (Doc. 47), filed June 28, 2016;

2.      Plaintiff's Opposition to Defendant's *Daubert* Motion and Motion in Limine to Exclude Expert Testimony (Doc. 51), filed July 8, 2016;

3.      Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses, and Incorporated Statement of Material Facts and Memorandum of Law (Doc. 40), filed June 24, 2016;

4.      Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. 50), filed July 8, 2016;

5.      Plaintiff's Reply in Support of Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. 55), filed July 22, 2016;

6.      Defendant's Motion for Summary Judgment and Memorandum of Law in Support (Doc. 43), filed June 24, 2016;

7.      Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 56), filed July 22, 2016; and

8.      Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 58), filed August 5, 2016.

## OVERVIEW

This action arises from the alleged breach of a contract for the sale of powdered nutritional supplements for runners. Currently pending are motions for summary judgment by both parties and Defendant's motion to exclude Plaintiff's damages expert, Richard Rampell ("**Rampell**"). (*See* Docs. 40, 43, 47.) Though brevity is the soul of wit,[1] the expanse of disagreement between the parties necessitates a thorough summary of the facts underlying the instant dispute. To provide context for the details that follow, the Court begins with a brief overview of the facts.[2]

Early in 2014, Plaintiff Nutrimatix Inc. ("**Nutrimatix**") formulated a business plan to place promotional electrolyte sticks ("**Electrolyte Sticks**") in post-race meal boxes at the October 2014 Marine Corps Marathon ("**MCM**") held in Washington D.C. Nutrimatix intended to use the Electrolyte Sticks to drive traffic to a mobile fitness application

---

[1]W. Shakespeare, Hamlet, Act II, Scene 2 (Lord Polonious).

[2]While Plaintiff seeks partial summary judgment on discrete affirmative defenses, the Court's resolution of this motion is untied to a material factual dispute. Conversely, the resolution of Defendant's motion turns on genuine factual issues, as Defendant seeks summary judgment on all of Plaintiff's claims and a breach-of-contract counterclaim. Hence the Court views the facts in the light most favorable to Plaintiff, who is the non-moving party with respect to the only factually significant motion. *See Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1008–09 (11th Cir. 2016).

("**Fitness App**"), where users could purchase one of eight customized nutritional supplements ("**Custom Supplements**") based on their nutritional needs.

Nutrimatix ordered the Electrolyte Sticks and Custom Supplements from Defendant Xymogen, Inc. ("**Xymogen**")—a manufacturer of vitamins and nutritional supplements, with its global headquarters in Orlando, Florida. The purchase orders specified expected delivery dates for the Electrolyte Sticks and Custom Supplements. Due to problems that arose during production, Xymogen was unable deliver the Electrolyte Sticks by the specified due dates or in time for the MCM. Instead, Xymogen delivered a portion of the original Electrolyte Stick order on December 9, 2014—in time for Nutrimatix to place the product in meal boxes at the Walt Disney World Marathon Weekend ("**Disney Marathon**") in January of 2015. By that time, Xymogen had delivered six of the eight Custom Supplement orders to Nutrimatix. But after receiving and verifying a customer complaint about the taste of one formula, Nutrimatix discontinued sales and brought suit against Xymogen for breach of contract and breach of warranty. In turn, Xymogen countersued for non-acceptance, non-payment, and wrongful rejection of the remaining Electrolyte Sticks and Custom Supplements.

On June 24, 2016, the parties each moved for summary judgment and to exclude the opposing party's expert witnesses ("***Daubert* Motions**"). As intimated at the final pretrial conference ("**PTC**"), the profuse disagreements between the parties have complicated the Court's task in resolving the pending motions. Thus, at the PTC, the Court heard oral argument on the pending motions and issued rulings on a portion of the *Daubert* Motions. In addition, on January 4, 2017, the Court held an evidentiary hearing on Xymogen's motion to exclude the Rampell's damages testimony. The instant

Order memorializes the Court's rulings on these motions.

## BACKGROUND

## I.     The Parties

Nutrimatix's chief executive officer ("**CEO**") Sergio Radovcic ("**Radovcic**") formed the company on March 11, 2014, with the goal of using a proprietary Fitness App to sell Custom Supplements to runners based on their nutritional needs. (Doc. 57, ¶¶ 2, 6.) Formulated by pharmacist Paul Sullivan ("**Sullivan**"), the Custom Supplements included the Male Basic formula, the Female Basic formula, the Male Inflammation formula, the Female Inflammation formula, the Male Sport formula, the Female Sport formula, the Male Total formula, and the Female Total formula. (*See* Doc. 57, ¶ 37; Doc. 1-1, p. 4.) To promote the Fitness App and garner sales, Radovcic intended to place free Electrolyte Sticks in post-race meal packages during the fall 2014 racing season, in conjunction with his preexisting company Fitful.[3] (*See* Doc. 57, ¶¶ 4, 6, 14; *see also* Doc. 57-5, p. 1.)

To this end, and in light of his prior business relationship with Xymogen,[4] Sullivan introduced Radovcic to Xymogen's executive vice president, Daniel Gulick ("**Gulick**"), on April 6, 2014 via e-mail. (Doc. 57, ¶ 5; *see also* Doc. 57-1, p. 2.) Due to Nutrimatix's mid-to-late summer launch targets, Sullivan advised Radovcic and Gulick to begin production discussions as soon as possible. (Doc. 57-1, p. 2.)

---

[3] Radovcic formed Fitful in 2010 to provide runners with "ready-to-eat," "balanced, environmentally friendly, [and] nutritious" meal boxes. (Doc. 56-1, pp. 9–11.) Fitful's first delivery was to the MCM in October of 2011. (*Id.* at 17.) Fitful also provided meal boxes at the Disney Marathon in January of 2012. (*Id.* at 11.)

[4] Sullivan had previously referred new customers to Xymogen. (Doc. 43-9, ¶ 4.)

Four days later, Radovcic and Gulick met in person in Scottsdale, Arizona, where Radovcic explained his business plan to Gulick. (Doc. 57, ¶ 6; *see also* Doc. 56-1, p. 21; Doc. 43-9, ¶¶ 5, 9.) During the meeting, Gulick indicated that Xymogen could make Nutrimatix's products. (Doc. 57, ¶ 6.) Thereafter, the two arranged for Radovcic to tour Xymogen's Orlando facility on April 23, 2014. (*See* Doc. 56-1, p. 20; Doc. 57, ¶ 7.) During the tour, Xymogen's representatives—including CEO Brian Blackburn—confirmed that they could make the stick packs. (Doc. 57, ¶ 7.) Radovcic subsequently chose to use Xymogen as Nutrimatix's manufacturer. (*Id.*)

## II.    Purchase Orders

Following the tour, Radovcic began coordinating with Xymogen on the stick pack order. (*Id.*) In the interim, Xymogen sent Radovcic sample sticks of "the base Nutrimatix custom formula." (Doc. 57, ¶ 11.) Though Radovcic approved these samples, he also expressed some concerns—namely that: (1) "some fairly large particles" remained present in the mixture when diluted"; and (2) that the sample "seemed rather sweet" when mixed with eight ounces of water. (Doc. 57, ¶ 11; Doc. 57-5.) In the same e-mail, Radovcic told Gulick that he was "looking forward to getting the electrolyte samples and getting [them] ordered to meet [their] October race schedule." (Doc. 57-5, p. 1.) Radovcic also reminded Gulick that he intended to: (1) use 100,000 Electrolyte Sticks in race meals to promote Nutrimatix; and (2) launch the Fitness App at the same time. (*Id.*; Doc. 57, ¶ 11.)

On July 29, 2014, Nutrimatix sent Xymogen a purchase order for 150,000 orange-flavored Electrolyte Sticks at a total cost of $18,915 (Doc. 57-7 ("**First Electrolyte Order**"); *see also* Doc. 57, ¶ 13; Doc. 43-9, ¶ 23.) The First Electrolyte

Order contained a due date of **September 12, 2014**. (*Id.*) Around this time, Gulick informed Radovcic: (1) that Xymogen had a maximum twelve-week production timeframe, beginning from the time Nutrimatix placed its order; and (2) that the Nutrimatix order would probably be finished within eight to nine weeks. (Doc. 57, ¶ 13.) Based on these representations, Radovcic assumed that Xymogen was already working within its twelve-week timeframe, as it had already finalized the formulas pending his tasting and approval, completed samples of the product, and begun creating labels for the stick packs. (*Id.*)

On this understanding, Nutrimatix e-mailed a purchase order for the Custom Supplements ("**Custom Supplement Order**") to Xymogen on August 11, 2014. (*See* Doc. 57-8 ("**August 11 E-mail Chain**") (documenting a chain of e-mails exchanged between Gulick and Radovcic on August 11, 2014); *see also* Doc. 57, ¶ 14.) Radovcic attached the Custom Supplement Order and the First Electrolyte Order to the August 11 E-mail, stating that he would wire a fifty-percent deposit on each Order the following day. (Doc. 57-8, p. 2.) Radovcic also asked Gulick to "confirm on [his] end that this [was] fine." (*Id.*) Gulick's response read: "Sergio all is good . . . wire the funds and let [sic] start rolling." (*Id.*)

Radovcic then sent Gulick an amended version of the Custom Supplement Order to reflect a pricing formula that Sullivan had discussed with Gulick. (*Id.* at 1.) As amended, the Custom Supplement Order requested 50,400 units of each formula at a total price of $107,911.44; it also contained an **October 31, 2014** due date. (Doc. 57-8, p. 1.) In the August 11 E-mail Chain, Radovcic stressed that the "entire company depend[ed] on having the product ready as soon as humanly possible" and that he

needed to have "the electrolyte sticks to Fiftful for insertion into food boxes for promotion or . . . risk missing the big marathon season." (*Id.* at 3.) Radovcic also indicated the same sense of urgency with respect to the "regular sticks for Nutrimatix boxes"—i.e., the Custom Supplements. (*Id.*) Gulick did not object to due dates reflected in the purchase orders. (Doc. 57, ¶ 14.)

The next day, Nutrimatix wired a $63,412 deposit to Xymogen—$9,457 for the First Electrolyte Order and $53,955 for the Custom Supplement Order. (Doc. 57, ¶ 15; Doc. 57-9.)

## III.    Formal Quotes

Over the next two weeks, Radovcic received and approved taste test samples for each of the Custom Supplements. (Doc. 57, ¶ 16.) Once approved, Radovcic signed custom formula quotes for each Custom Supplement on **August 20, 2014**. (Doc. 57, ¶ 17; Doc. 57-11 ("**Quotes**").)  The Quotes signed by Radovcic did not contain the quantity of product that Nutrimatix had ordered. (Doc. 57, ¶ 17.) Rather, according to Gulick, the Quotes were a standard requirement of Xymogen's manufacturing process, pursuant to which Xymogen requires its customers to sign formal quotes before it orders any raw materials or manufactures any product. (Doc. 43-9, ¶ 21.) Such quotes contain: (1) a list of all active and inactive ingredients for the product; (2) provisions relating to the customer's taste approval; (3) details for the product packaging components; (4) testing requirements; (5) pricing information; (6) shelf life dating provisions; and (7) provisions concerning additional certifications. (*Id.*; *see also* Doc. 57, ¶ 17).)

However, the evidence demonstrates that Xymogen made certain concessions to Nutrimatix with respect to its standard requirements. For example, Gulick informed Radovcic that Xymogen had received the "devil claw extract" ingredient for the Custom Supplements on August 14, 2014—almost a week before Radovcic signed the Quotes. (Doc. 57-10, p. 1.) Additionally, Gulick instructed Radovcic to disregard an email he received from a Xymogen sales representative, which: (1) detailed expected turnaround times for producing formula samples for approval, obtaining a signed quote, ordering raw materials, and making product labels; and (2) advised Radovcic of the potential for delays beyond Xymogen's control, including those caused by late prepayment, label modification, unexpected machinery breakdown, and packaging problems. (Doc. 57, ¶ 18; Doc. 57-12 ("**August 27, 2014 Email**").) Because the timeframes described in the August 27, 2014 Email included many steps that Nutrimatix had already completed, Radovcic assumed that there were no issues with the timeframes he had previously discussed with Gulick. (Doc. 57, ¶ 18.)

## IV. Production Delays

Around this time, communication between the parties began to break down—first with respect to correspondence concerning the packaging and labeling of Nutrimatix's products. (*Id.* ¶ 19.) On September 18, 2014, Radovcic sent Gulick an e-mail expressing his concerns about unanswered correspondence, a pattern of delays, and a lack of transparency in their business communications. (Doc. 57-13.) Radovcic also expressed concerns about Xymogen's ability to meet Nutrimatix's deadlines. (*Id.*)

By October 10, 2014, Xymogen had still not delivered any of the products ordered by Nutrimatix. (Doc. 57, ¶ 20.) This delay created significant tension, as Fitful

was obligated to provide 30,000 Electrolyte Sticks in post-race meal boxes for the MCM and Nutrimatix had planned to use this placement to promote the launch of its Fitness App. (*See* Doc. 57-14; Doc. 57, ¶ 20.) Attempting to salvage the situation, Radovcic asked Gulick if it was possible for Xymogen to complete 30,000 Electrolyte Sticks by October 20 and send them to D.C. via two-day shipping. (Doc. 57-14.) But due to problems that Xymogen encountered with its stick pack machine ("**INVR Machine**"), Gulick intimated that it was unlikely that Xymogen would be able to ship 30,000 Electrolyte Sticks by October 20. (Doc. 57-15.) Ultimately, Xymogen could not supply the Electrolyte Sticks in time for the MCM; therefore, to meet its obligation, Radovcic bought a competitive electrolyte product on the open market at full price. (Doc. 56-1, p. 23.)

Problems with the INVR Machine persisted, as the machine began experiencing problems with "weight variation in the packets." (*Id.*) To remedy this problem, Gulick proposed adding a flow agent to the Custom Supplements on October 20, 2014. (Doc. 57, ¶ 22; *see also* Doc. 57-16; Doc. 43-9, ¶ 40.) Radovcic "grudgingly" agreed, as he felt it was the only way for Xymogen to complete the Custom Supplements on time, and Nutrimatix would not have been able to secure an alternative product for the fall racing season. (*See* Doc. 57, ¶ 23; Doc. 57-17.) Gulick told Radovcic that the addition of the flow agent would not materially change the taste of the Custom Supplements or affect the other ingredients. (Doc. 57, ¶ 23.)

On October 22, 2014, Radovcic sent Gulick a list of November racing events at which Fitful was scheduled to provide post-race meals and, by extension, the Electrolyte Sticks. (*See id.* ¶ 24; Doc. 57-18.) Based on Gulick's representations that Xymogen was

"working around the clock to correct its manufacturing issues," Radovcic thought that Xymogen would be able complete the orders in time to make most of the November events. (Doc. 57, ¶ 24.)

On November 6, 2014, Gulick sent Radovcic an e-mail representing that: (1) Xymogen had finished the Male Basic formula; (2) another of the Custom Supplement formulas was already running on the INVR Machine; and (3) each remaining Custom Supplement would follow every two days. (Doc. 57-19.) However, on November 12, 2014, Radovcic learned that neither the Male nor the Female Basic formulas had been shipped. (Doc. 57-20.) At this point, Radovcic informed Gulick that Xymogen was fifteen days past the October 31 deadline and asked him for a reasonable estimate of when the orders would be completed. (*Id.*) As of November 21, Xymogen had only shipped the Male Basic formula and none of the Electrolyte Stick Packs (Doc. 57, ¶ 27), prompting Radovcic to send Gulick a lengthy email concerning Xymogen's constant delays and misrepresentations with respect to expected delivery dates. (*Id.*; *see also* Doc. 57-21 ("**November 21 E-mail**").) In the November 21 E-mail, Radovcic also asked Xymogen for written shipping dates for each Custom Supplement and the First Electrolyte Order.

Xymogen made attempts to address its continued INVR machine problems and speed up production. In particular, prior to the November 21 e-mail and in the weeks that followed, Gulick: (1) recommended the addition of flow agent to the Electrolyte Sticks to improve the material flow[5] (Doc. 57, ¶ 28; Doc. 57-22); and (2) made several

---

[5] The flow agent added to the Custom Supplement was arabinogalactan. (Doc. 43-9, ¶ 41.) Due to its cost, Radovcic requested that a different flow agent be added to the Electrolyte Sticks. (*Id.* ¶ 43.) Ultimately, with Radovcic's approval,

representations about the amount of product it had already completed, the additional shifts that Xymogen would work to complete Nutrimatix's orders, and the length of time that it would take to run the Custom Supplement formulas through the INVR Machine (*see, e.g.*, Docs. 57-20, 57-22, 57-23, 57-24).

Despite maintaining that Xymogen was "past any possible deadline", Radovcic told Gulick to send the late orders (Doc. 57-23) and requested updates on the balance of the shipments (*see e.g.*, Doc. 57-24). By December 9, 2014, Nutrimatix had launched its Fitness App, yet had only received one Custom Supplement. (Doc. 57, ¶ 30.)

## V.    Partial Receipt of Product and Reorder

Xymogen eventually shipped 70,000 Electrolyte Sticks to Nutrimatix on December 9, 2014 ("**Partial Electrolyte Order**") (Doc. 57, ¶ 30), which was less than half the 150,000 units requested in the First Electrolyte Order (*see* Doc. 57-7). On January 5, 2015, Xymogen shipped four of the Custom Supplements to Nutrimatix— 44,373 units of the Male Total formula, 44,500 units of the Female Total formula, 45,500 units of the Male Sport formula, and 44,400 units of the Female Sport formula. (*Id.* ¶ 30; Doc. 43-9, pp. 11, 19.) Notably, Nutrimatix had requested 50,400 of each formula in its Custom Supplement Order. (Doc. 57-8.)

Perhaps to make the best of a less-than-ideal situation, Nutrimatix used the Partial Electrolyte Order to promote the Fitness App during the 2015 Disney Marathon weekend, that ran from January 7 through January 11. (Doc. 57, ¶ 32.) Over 1,000 people downloaded the Fitness App, and Nutrimatix began filling orders. (*Id.*) But because it had not received the Male and Female Inflammation formulas, Nutrimatix

---

Xymogen added corn maltodextrin to the Electrolyte Sticks. (*Id.*)

was unable to service customers with corresponding fitness data. (*Id.*)

After the Disney Marathon weekend, Radovcic learned that Xymogen had still not completed the First Electrolyte Order, which Nutrimatix needed to meet Fitful's meal box requirements. (*See id.* ¶ 33.) In response to Radovcic's inquiries, Gulick told Radovcic to place a second order because the addition of a flow agent to the Electrolyte Stick formula required Radovcic to execute a second formal quote. (*See id.*; *see also* Doc. 43-9, ¶ 47.) Radovcic executed and sent a quote for the revised electrolyte formula on January 16, 2015 ("**Second Electrolyte Order**"). (Doc. 43-9, pp. 11, 20–24.) Nutrimatix did not pay a deposit on the Second Electrolyte Order, nor did it ever receive it. (*Id.*)

## VI.   Payment Disputes

In January of 2015, more disputes arose between the parties—this time regarding payment. In particular, on January 20, 2015, Radovcic received an email from Xymogen requesting payment of past-due invoices ("**Unpaid Invoices**"). (*Id.* ¶ 34; *see also* Doc. 57-25.) In his response, Radovcic pointed out that the invoices did not reflect Nutrimatix's payment of deposits. (Doc. 57-25.) While Radovcic stated that Nutrimatix would "immediately process any payments ACTUALLY due, based on the product [it had] ACTUALLY [received]," he also complained about the untimeliness of the Xymogen's deliveries. (*Id.*)

By early February, Xymogen had completed 43,500 units of the Male Inflammation formula, 44,000 units of the Female Inflammation formula, and 183,000 sticks for the Second Electrolyte Order. (Doc. 43-9, ¶ 50.) However, Xymogen did not ship these products to Nutrimatix in light of the Unpaid Invoices. (*Id.* ¶ 51.)

## VII.    Customer Complaint

Further complications arose on March 9, 2015, when Radovcic received a customer complaint stating that the Male Total formula tasted like a "chewed up One-a-day vitamin" with "barely any citrus and fizz." (Doc. 57, ¶ 36; Doc. 56-27.) After further inspection, Radovcic and Sullivan each concluded that the Male Total formula "tasted horrible" and "was unacceptable." (Doc. 57, ¶ 37; *see also* Doc. 56-1, pp. 25–26.) Nutrimatix immediately stopped sales of the Total formulas and informed Gulick, who offered to refund the Total formulas. (Doc. 57, ¶¶ 37, 38.) Based on his belief that Xymogen had ruined his company, Radovcic refused to pay for or accept delivery of the remaining Inflammation formulas, though Gulick had informed him that the order was complete. (Doc. 56-1, pp. 24–25; *see also* Doc. 57-26.) Accordingly, Xymogen never shipped the Inflammation formulas. (*See* Doc. 57, ¶ 35.)

## VIII.    Formal Demand Letter and Suit

On April 30, 2015, Radovcic sent Xymogen a formal demand letter via e-mail, detailing his complaints about the "unusable formulas," "numerous delays," and the lost profits and marketing opportunities caused by Xymogen's late and defective deliveries. (Doc. 57-29 ("**Demand Letter**").) In the Demand Letter, Radovcic requested reimbursement for the costs that Nutrimatix had expended up to that point. *(Id.*) Though Gulick advised Radovcic that he would get back to him after discussing the matter with his team (*id.*), Xymogen never responded to the demand (Doc. 57, ¶ 39).

Ultimately, Nutrimatix filed the instant lawsuit on May 15, 2015, asserting claims for breach of contract and breach of warranty. (Doc. 1.) Nutrimatix's breach-of-contract claim is premised on Xymogen's failure: (1) to deliver the Custom Supplements on time;

(2) to deliver the requested number of Electrolyte Sticks on time; and (3) to deliver any of the Custom Supplement products. (Doc. 1, ¶¶ 40–44.) Additionally, Nutrimatix alleges that Xymogen breached its warranties by: (1) delivering Custom Supplements that did not conform to the specifications previously agreed to by the parties; and (2) delivering two Custom Supplements that were substantially inferior in taste to the samples it had provided. (*Id.* ¶¶ 45–54.) In its Answer, Xymogen asserts several affirmative defenses; Xymogen also asserts counterclaims for non-acceptance and breach of contract. (Doc. 8.)

## EXPERT OPINIONS

Xymogen has moved to exclude the report of Rampell. (Doc. 47.) In his report, Rampell opines that Nutrimatix incurred the following damages as a result of the acts and omissions of Xymogen: (1) lost profits in the amount of $15,608,202; (2) production and inventory acquisition costs in the amount of $152,386; (3) unrecovered startup and operating expenses in the amount of $251,111; and (4) residual expenses constituting $3,000 for lab testing and $27,945 in rental expenses for storage of the alleged defective products. (Doc. 47-1 ("**Rampell Report**").)

Xymogen argues that the Rampell Report is inadmissible because: (1) Nutrimatix failed to timely disclose a significant change in its theory of damages; (2) Xymogen did not have reason to know that a ninety-day delay in delivery would lead to more than $15 million in lost profits; (3) Nutrimatix's business was completely destroyed in 2015, thus precluding the recovery of lost profits; (4) the Rampell Report is unreliable and relies on flawed methodology in derogation of *Daubert*; and (5) Rampell's estimate of lost profits are too speculative to be submitted to the jury and contain damages not

caused Xymogen. (Doc. 47.) Nutrimatix opposes the motion. (Doc. 51.)

## I.    Damages Theory Changes

First, the Court rejects Xymogen's contention that Nutrimatix failed to disclose a change in its theory of damages in a timely manner. As an initial matter, the Complaint "states that Nutrimatix suffered lost profits and lost business opportunities caused by Xymogen's delivery problems" and sufficiently notifies Xymogen that Nutrimatix is seeking damages for lost profits resulting from Xymogen's breach. (Doc. 1, pp. 10–11.) Furthermore, in its initial disclosures, Nutrimatix indicated that it had suffered "[l]ost business opportunities and profits from the delay of its product launch," of "at least approximately $180,000." (*See* Doc. 47-6.) However, Xymogen contends that such disclosure was incorrect or incomplete and that Nutrimatix was required to amend its disclosure to indicate that the Rampell Report would project lost profits over a three-year period, rather than estimating only "delay damages." (Doc. 47, p. 4.) As such, Xymogen argues that "Nutrimatix's complete change in theory, as well as the magnitude of the disparity [and timing] between Nutrimatix's initial estimate and the amount in the Rampell Report . . . is prejudicial and contrary to Rule 26." (*Id.* at 4–5.)

In response, Nutrimatix maintains that it never changed its theory of damages and did not have a final calculation of its lost profits until Rampell completed his Report, which it timely served on Xymogen. (*Id.* at 2.) Nutrimatix also maintains that Xymogen suffered no prejudice because Nutrimatix served the Rampell Report on Xymogen on April 8, 2016—well before the discovery deadline of May 27, 2016. (*Id.*) The Court agrees. Nutrimatix was not bound by the approximation made in its initial disclosures. Further, Nutrimatix disclosed the Rampell Report to Xymogen by the Court-mandated

deadline. Accordingly, Xymogen has not shown sufficient prejudice to exclude Rampell's opinions.

## II.    Knowledge of Potential Consequential Damages

Xymogen's second point of contention is that it had no reason to know at the time of contracting that a ninety-day delay in delivery would lead to $15 million in lost profits. (Doc. 47, pp. 5–6.) In support, Xymogen cites § 672.715(1) of the Florida Statutes, which limits consequential damages resulting from a seller's breach of contract to "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting *had reason to know* and which could not reasonably be prevented by cover or otherwise" (emphasis added). However, Nutrimatix's proffered evidence reveals that, both before and at the time of contracting, Radovcic shared with Xymogen his business plan and the impact that untimely delivery could have on the company. (Doc. 51-1, pp. 40–41; Doc. 51-2, p. 1 (stating that the "entire company depends on having the product ready as soon as humanly possible").) As such, whether Xymogen had reason to know at the time of contracting that delivery delays could lead to a steep loss of profits is a factual matter for determination by the jury, not a basis for exclusion. *See Nature's Prods., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1316 (S.D. Fla. 2013) (stating that the jury should weigh the evidence and resolve at trial all factual questions relating to consequential damages). Indeed, pursuant to the Florida Standard Jury Instructions, the Court will instruct the jury at trial that "[t]o recover special damages, [Nutrimatix] must prove that when the parties made the contract, [Xymogen] knew or reasonably should have known of the special circumstances leading to such damages." *Fla. Standard Jury Instructions—Contract and Business Cases*, Instruction

504.2 Breach of Contract Damages (2013).

## III. Damages for Completely Destroyed Business

Xymogen's motion also seeks exclusion of the Rampell Report on the ground that a completely destroyed business may only recover the market value of the business as of the date of loss and may not recover lost profits. (Doc. 47, pp. 9–10.) According to Xymogen, Nutrimatix was completely destroyed in the spring of 2015 when it halted its sales. (*Id.* at 10.) Nutrimatix disputes this and maintains that although it has since changed its name to "Styr Labs" "to distance itself from the failed product launch and damaged brand caused by Xymogen," it remains the same entity with the same rights, obligations, key personnel, and nutritional personalization technology. (Doc. 51, p. 6.) Under its new name, Nutrimatix has contracted to obtain custom supplements from a different supplier and re-launched its Fitness App to sell these supplements during the summer of 2016. (Doc. 51, p. 6.)

Upon consideration, the Court is persuaded that a business that is interrupted, rather than completely destroyed, may still recover lost profits caused by the defendant's conduct. *See Zinn v. GJPS Lukas, Inc.*, 695 So. 2d 499 (Fla. 5th DCA 1997). Because Xymogen has not conclusively demonstrated that Nutrimatix was completely destroyed, the Court declines to exclude the Rampell Report on this basis.

## IV. *Daubert* Challenges

### A. Legal Standards

In its gatekeeping role, a district court is tasked to ensure that juries only hear "expert" opinions that are qualified, reliable, and helpful to the fact-finder. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998); *see also*

*Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 965–67 (11th Cir. 2013). The Court must abstain from credibility determinations and any assessment of the merits of an expert witness's opinion—which are matters exclusively reserved to juries—and must instead narrowly focus on whether the proponent of the expert witness has established the qualification, reliability, and helpfulness requirements.[6] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–95 (1993); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155 (2000).

The proponent of an expert opinion has the burden of establishing admissibility. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)); *see also Frazier*, 387 F.3d at 1260. The proponent does not have to prove that the opinion is scientifically correct, just that it is reliable and helpful, and the witness is qualified. *See Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002) (citing Fed. R. Evid. 702, Advisory Committee Notes). If the proponent does so, then the court opens the gate because the Court's limited gatekeeping role "is not intended to supplant" presentation of contrary evidence to the jury or the practice of cross-examination in a courtroom. *See United States v. Ala. Power Co.*, 730 F.3d 1278, 1282–85 (11th Cir. 2013). Rather, the jury must resolve the parties' remaining reliability and relevance disputes—preferably based on the litigants': (1) presentation of contrary evidence, such as testimony from the litigant's own expert witness providing both contrary opinions and criticism; and (2) cross-examination and appropriate legal argument. *See id.*; *see also Costa v. Wyeth, Inc.*, No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

---

[6] Because Xymogen has not challenged Rampell's qualifications, the Court focuses on the reliability and helpfulness requirements.

## B.    Discussion

Xymogen contends that Rampell's lost profits calculation falls short of meeting the reliability requirement. (Doc. 47, pp. 10–19.) The reliability requirement turns on a plethora of matters that vary depending on the opinions and testimony at issue, and include the following well-known *Daubert* factors:

(1)     whether the expert's theory can be or has been tested;

(2)     whether the theory has been subject to peer review and publication;

(3)     the known or potential rate of error of the particular scientific technique; and

(4)     whether the technique is generally accepted in the scientific community.

*Daubert*, 509 U.S. 579; *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). The reliability requirements and *Daubert* factors "are only illustrative and may not all apply in every case." *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005). Ultimately, the district court must identify the pertinent factors, and it is accorded "wide latitude in deciding how to determine reliability." *Id.*

The Supreme Court of Florida most recently clarified its position on the recovery of lost profits for new businesses in *W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Limited*, 545 So. 2d 1348 (Fla. 1989) ("**Wharfside**"). The *Wharfside* decision held that "[a] business can recover lost prospective profits regardless of whether it is established or has any 'track record'" so long as the party proves that: "(1) the defendant's actions caused the damage[;] and (2) there is some standard by which the amount of damages may be adequately determined." 545 So. 2d at 1351. In doing so, the *Wharfside* court reaffirmed its prior decision in *Twyman v. Roell*, 166 So. 215 (Fla.

1936), which held that "if there is a yardstick or measure of damages by which prospective profits may be determined and they arise out of a contract in which profit is the inducement to its making, they may be followed if proven." 166 So. at 217. Such amount must be established "with reasonable certainty" and "[t]he requisite to their allowance is some standard, such as regular market values, or other established data, by reference to which the amount may be satisfactorily ascertained." *Id.*

State and federal courts interpreting Florida law on this issue recognize three distinct methods for calculating lost profits—(1) the yardstick method[7]; (2) the "before and after" method[8]; and (3) the projected sales method.[9] That said, Florida law does not require a business to employ any of these methods to recover lost profits. *Marshall*, 2003 WL 25668018, at *7. Rather, in assessing the reliability of Rampell's opinion, the Court need only determine whether there is "*some* standard by which the amount of [Nutrimatix's] damages may be adequately determined." Upon consideration of the

---

[7] The yardstick test "consists of a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974). Pursuant to *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981), decisions handed down by the U.S. Court of Appeals for the Fifth Circuit prior to the close of business on September 30, 1989, are binding as precedent in the Eleventh Circuit.

[8] "The before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it." However, this theory "is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits." *Lehrman*, 500 F.2d at 667.

[9] "The projected sales theory allows an expert to estimate what a company's profit margin would have been in the absence of a negligent act based on the plaintiff's past accounts with repeat or regular customers. As long as there is data from which anticipated future profits can reasonably be ascertained, lost profits can be recovered under the projected sales theory even in the absence of a contract requiring customers to patronize the plaintiff's business." *Marshall Auto Painting & Collision, Inc.*, No. 6:02-cv-109-Orl-22KRS, 2003 WL 25668018, at *7 n.46 (M.D. Fla. May 8, 2003)

methodology used in the Rampell Report, the Court concludes that the standard used to calculate lost profits meets the *Daubert* criteria.

In developing and applying the methodology for his calculations, Rampell—a certified public accountant—relied on a practice aid published by American Institute of Certified Public Accountants for calculating lost profits. (Doc. 47-1, pp. 1, 2.) In formulating his opinions, Rampell considered: (1) information provided by Radovcic; (2) historical data from the nutrition and supplement industry data; and (3) the market outlook. (Doc. 47-1, p. 3.) Rampell then evaluated Radovcic's business projections for 2014–2016 and adjusted them based on his experience and market research. (*Id.*) Rampell also considered historical fitness app growth rates and historical conversion rate data. (Doc. 47-1, p. 7.)

On this record, Rampell began with Nutrimatix's record of sales following the Disney Marathon in January of 2015, at which time users downloaded the Fitness App 1,248 times and placed 180 orders for the Custom Supplements. (*Id.*) From this direct sampling campaign, Rampell calculated the conversion rate of downloads to purchases ("**Order Rate**") as 14.42%. (*Id.*) Comparatively, the average U.S. Order Rate in 2015 was 3.35% for tablets and only 1.22% for smartphones. (*Id.*) Based on this data, Rampell opined that the success of the Fitness App's launch, with only minimal promotion, provided a basis to calculate Nutrimatix's potential for success upon entry in the market. (*Id.*)

Rampell then: (1) compared Nutrimatix's projected downloads for 2014–2016 with the number of downloads from other fitness apps to arrive at his own projection for 2014; and (2) used the average growth rates for selected fitness apps to project the

number of downloads for 2015 and 2016 ("**Projected Downloads**"). (Doc. 51, p. 8; Doc. 47-1, p. 19.) Though Nutrimatix's Order Rate following the Disney Marathon was 14.42%, Rampell used a 2.4% Order Rate ("**Projected Order Rate**") in his lost profits calculation "to account for the risk that the conversion rates would not in the near future be as robust as actually experienced by Nutrimatix in the past." (Doc. 47-1, pp. 7, 19; Doc. 51, p. 9.) As indicated in his report, the lower Order Rate was a weighted average of the actual conversion rates in published industry app-to-app product purchase conversion rates. (Doc. 47-1, p. 19; Doc. 51, p. 9.) Next, Rampell multiplied the number of Projected Downloads by the Projected Order Rate to calculate the number of units that would have been sold. (Doc. 47-1, p. 19.) Multiplying this number by the unit price ($44), Rampell arrived at the amount of initial projected sales. (*Id.*) Rampell then used the reorder rate from Nutrimatix's business projections to arrive at the total projected sales. (*Id.*) This reorder rate—or repeat customer estimate—was based on Radovcic's experience and knowledge of the vitamin and supplement industry, as well as historical information on subscription-based services. (Doc. 47-1, pp. 7–8.) Finally, Rampell subtracted Nutrimatix's costs, expenses, depreciation, taxes, and sales revenue realized to calculate total lost profits of $15,608,202.00.

Contrary to Nutrimatix's representation, Rampell's methodology is not a classic example of the projected sales method for calculating lost profits. But under Florida law, Rampell's deviation from this model is of no consequence. *See Marshall*, 2003 WL 25668018, at *7. Indeed, Rampell's application of methodology promulgated by the American Institute of Certified Public Accountants leaves the Court hard pressed to find reason to exclude the Rampell Report on grounds of unsound methodology

despite the magnitude of the projected loss that results. Xymogen's concern about the size of the claim, while understandable, does not justify exclusion.

The Court is persuaded by the rationale in *Lehrman v. Gulf Oil Corporation*, 500 F.2d 659 (5th Cir. 1974), which recognized that the plaintiff's method of calculating lost profits was not a classic example of the yardstick or before and after theories, but rather had elements of each. 500 F.2d at 667–68. Ultimately, the *Lehrman* court found that the plaintiff's unique tailoring of such method of proof to fit his case did not render it unacceptable. *Id.* at 668. The deviations here are likewise not disqualifying.

As additional grounds for exclusion, Xymogen contends that Rampell's lost profit analysis is flawed because it: (1) fails to assess potential pitfalls in Nutrimatix's marketing strategy; (2) fails to account for reasonable mitigation strategies; (3) is not limited to delay damages alleged in the Complaint; and (4) fails to reduce the damage estimates to their present value. Such challenges attack the values used in Rampell's methodology, rather than the methodology itself. Having already concluded that such methodology is sound under *Daubert*, any alleged errors in its application go to the credibility of Rampell's opinions, rather than their reliability. *Quiet Tech.*, 326 F.3d at 1344–45; *see also Furmanite Am.,* 506 F.2d at 1132. Indeed, "[t]he identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech.*, 326 F.3d at 1344–45. As such, this "garbage in, garbage out" argument is insufficient to require exclusion under *Daubert*.[10]

---

[10] Additionally, although Florida law requires a jury to reduce an award of future profits to its present value, there is no requirement that a party introduce expert testimony to aid a jury in its determination of present value. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1180 (11th Cir. 2002). It is sufficient if the Court instructs the jury that damages for future loses must be limited to the present cash value of the future

Rampell's lost profit calculation is not unduly speculative. While Xymogen is correct that an award of damages for lost profits may not be based upon speculation or conjecture, *E. Qualcom Corp. v. Glob. Commerce Ctr. Ass'n*, 59 So. 3d 347, 351 (Fla. 4th DCA 2011), lost profits may be based on reasonable estimates, *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Dirs. Corp.*, 943 F.3d 1511, 1518 (11th Cir. 1991); *see also Twyman*, 166 So. at 218 ("If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person.") Notably, "[t]he uncertainty which defeats recovery in such cases has reference to the cause of the damage rather than to the amount of it." *Twyman*, 166 So. at 218.

Here, Rampell began with Radovcic's pre-launch business projections, which Radovcic reached using his business experience as an entrepreneur, as well as his personal knowledge of the nutritional supplement industry. Rampell then evaluated these projections for reasonableness, comparing them with industry data and adjusting them accordingly. As in *Lehrman*, this Court concludes that such evidence is not unduly speculative but rather "a just and reasonable estimate of damages under difficult circumstances based on relevant data." *Lehrman*, 500 F.2d at 671. Though "unquestionably open to challenge," such evidence may be submitted to the jury for resolution. *Id.* at 668. Indeed, "once the causation hurdle has been overcome, the expert on damages need not be armed on the right hand with a slide rule [and] on the left hand with a computer. He is allowed some economic imagination so long as it does not become fantasy." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 25

loss. *Id.*

(5th Cir. 1974). Whether the jury will accept the reasonableness of Radovcic's protjection or the other assumptions inherent in Rampell's opinion remains to be seen. To be sure, rigorous cross-examination may well substantially undercut its foundation.

To this point, Xymogen argues that the Rampell Report includes damages not caused by Xymogen—namely, costs for a replacement electrolyte product for the MCM, the reengineering of boxes for the Electrolyte Product, startup and operating expenses, testing, and storage of the allegedly defective product. The Court's review of the Rampell Report reveals that Rampell has provided an adequate basis to establish a causal link between these alleged damages and Xymogen's conduct. (*See* Doc. 47-1, pp. 4–7.) As such, Xymogen's arguments are more properly reserved for the jury.

## THE SUMMARY JUDGMENT MOTIONS

## I. Standards

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant has two options: (1) the movant may simply point out an absence of evidence to support the nonmoving party's case; or

(2) the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *U.S. v. Four Parcels of Real Property in Green & Tuscaloosa Cntys. in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325).

"The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248) (1986)).

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle*, 468 F.3d at 759. However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## II.    Nutrimatix's Motion for Summary Judgment

Nutrimatix moves for summary judgment on several of Xymogen's affirmative defenses. (Doc. 40.) In particular, Nutrimatix contends that Xymogen can produce no evidence in support of the following defenses: (1) first, that any change in the taste of the Custom Supplements resulted from intervening or supervening causes—namely, the handling process or the storage of such goods once out of Xymogen's control; and (2) second, that any change in the taste of such goods from the time it was

manufactured and delivered to the time customers opened the goods resulted from the custodial interference of Nutrimatix or the custodial interference of Nutrimatix's customers. (*See* Doc. 8, ¶¶2–3, 10.) The Court agrees.

Importantly, Xymogen bears the burden of proof on its affirmative defenses at trial. *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F. 3d 1107, 1110 (11th Cir. 2008). Thus, once Nutrimatix pointed to an absence of supporting evidence for these defenses, the burden shifted to Xymogen to present affirmative evidence to show that a genuine issue of material fact exists for trial. *Four Parcels*, 941 F.2d at 1438; *Porter*, 461 F.3d at 1315. However, in its response, Xymogen misstates the applicable burden and argues that *Nutrimatix's* failure to provide affirmative evidence to either contradict Xymogen's affirmative defenses or demonstrate the products' storage conditions its fatal to its motion. (Doc. 50.) Not so.

Therefore, because Xymogen failed to present any affirmative evidence demonstrating that an intervening cause, supervening cause, or the custodial inference of Nutrimatix or its customers caused the bitter tasting products alleged in the Complaint, Nutrimatix's motion for partial summary judgment is due to be granted.

## III. Xymogen's Motion for Summary Judgment

For its part, Xymogen moves for summary judgment on Nutrimatix's breach of contract and breach of warranty claims. (Doc. 43.) Xymogen also moves for summary judgment on Count III of its Counterclaims, which alleges that Nutrimatix failed to pay Xymogen the full contract price. (*Id.*)

### A. Contract Claims

Upon consideration, the Court concludes that material factual disputes prevent

Xymogen from succeeding on its motion for summary judgment as to either party's breach-of-contract claims. Specifically, the Court finds that genuine issues of material fact remain concerning: (1) whether time was of the essence, and if not, whether delivery occurred within a reasonable time; (2) whether Nutrimatix provided Xymogen with adequate notice of breach; (3) whether Nutrimatix waived its breach of contract claims with respect to untimely delivery; and (4) whether Xymogen breached the contract by failing to deliver the Custom Supplements on time, thus excusing Nutrimatix from its obligation to pay Xymogen the full contract price. In light of these factual disputes, these issues must be submitted to a jury for determination.

The Court writes further only to resolve the parties' disagreement over which document contains the essential terms of their contractual obligations. Nutrimatix maintains that the purchase orders evidence the contract terms, Xymogen contends that the Quotes alone govern the terms of the parties' agreement (Doc. 43-9, ¶ 2). Upon review of the evidence and Florida law governing the formation of a contract for the sale of goods, the Court agrees with Nutrimatix.

Ordinarily, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Fla. Stat. § 672.204(1). Under Florida law, a contract ordinarily requires: (1) an offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014). The only essential term in a contract for the sale of goods is the quantity. Fla. Stat. § 672.201(1) & cmt. 1 ("The only term which must appear [in the writing] is the quantity term[,] which need not be accurately stated but recovery is limited to the

amount stated.")

Because the Quotes do not contain a quantity term (*see* Doc. 57-11), they do not constitute a valid contract for the sale of goods. The First Electrolyte and Custom Supplement Orders (collectively, "**Purchase Orders**"), however, do contain a quantity term, and review of the parties' electronic communications also evidences satisfaction of the remaining elements necessary for contract formation.

Specifically, Radovcic attached the Purchase Orders to the August 11 E-mail chain. (Doc. 57-8.) In this e-mail, Radovcic stated that he would wire a fifty-percent deposit to Xymogen for each Purchase Order the following morning; he also asked Gulick to confirm that this was acceptable. (Doc. 57-8.) Gulick's response stated: "all is good . . . wire the funds and let [sic] start rolling." (*Id.*) Radovcic wired the deposits the following day. (Doc. 57-9.) In accordance with Florida law, the foregoing correspondence demonstrates the existence of a contract as it demonstrates: (1) an offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *See Kolodziej,* 774 F.3d at 740–41.

Next is the question of whether there is a sufficient writing:

> a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

Fla. Stat. § 672.201(1). Exceptions to this requirement include valid contracts:

> (a)   Where the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial

> beginning of their manufacture or commitments for their procurement;
>
> (b) Where the party against whom enforcement is sought admits in his or her pleading, testimony or otherwise in court that a contract for sale was made . . . ; or
>
> (c) With respect to goods for which payment has been made and accepted or which have been received and accepted.

Fla. Stat. § 672.201(3).

Here, the Purchase Orders evidence a contract for the sale of goods for the price of more than $500 (*see, e.g.*, Doc. 57-8), thus triggering the writing requirement of § 672.201(1) of the Florida Statutes. The Purchase Orders are not signed by either party; thus, to be enforced, the Purchase Orders must fit within one of the exceptions under § 672.201(3).

A contract that does not satisfy section (1), but is valid in other respects, is enforceable if the party against whom enforcement is sought admits in his or her pleading, testimony or otherwise in court that a contract for sale was made. Fla. Stat. § 672.201(3)(b). Under section (2), a confirmatory writing between merchants satisfies the requirements of section (1) if it is sent within a reasonable time and the party receiving it has reason to know of its contents and fails to object within ten days of its receipt.

Xymogen admitted in its Answer to the Complaint that a contract existed between the parties, but it disavowed the existence of an enforceable contract in the Joint Pretrial Statement. (*Compare* Doc. 8, *with* Doc. 68.) When questioned about this change in position at the PTC, counsel for Xymogen indicated his belief that the matter of mutual assent was in dispute. As this issue was not raised in the parties' pre-trial motions, nor briefed, the Court declines to reach this specific dispute, which—according to the

representations of Counsel—appears to turn on a factual dispute. The parties, therefore, are free to litigate the existence of an enforceable contract at trial.

**B.      Breach of Warranty Claim**

Additionally, the Court finds that Xymogen has not met its burden to demonstrate that it is entitled to judgment as a matter of law on Nutrimatix's breach of warranty claim. In so finding, the Court rejects Xymogen's argument that Nutrimatix's Complaint fails to properly plead the elements for breach of implied warranties. Moreover, the balance of the parties' briefing demonstrates that genuine issues of material fact exist with respect to this claim, thus precluding summary judgment.

**CONCLUSION**

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.      Defendant's *Daubert* Motion and Motion in Limine to Exclude and Strike the Testimony and Report of Richard Rampell (Doc. 47) is **DENIED**.

2.      Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses, and Incorporated Statement of Material Facts and Memorandum of Law (Doc. 40) is **GRANTED**.

3.      Defendant's Motion for Summary Judgment and Memorandum of Law in Support (Doc. 43) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on January 27, 2017.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record